UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| JOHN W. APEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:13CV84 JAR |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) for judicial review of the Commissioner of Social Security's final decision denying John W. Apel's ("Apel") application for disability insurance benefits Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.*, and supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381–85.

### I. Background

On November 3, 2010, Apel filed an application for disability insurance under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and for supplemental security income under Title XVI, §§ 1381-1385. (Tr. 174-180, 181-188). The Social Security Administration ("SSA") initially denied Apel's claim on February 14, 2011. (Tr. 94-96). He filed a timely request for a hearing before an administrative law judge ("ALJ") on February 28, 2011. (Tr. 113-14). Following a hearing on July 10, 2012 (Tr. 29-71), the ALJ issued a written decision on July 26, 2012, upholding the denial of benefits. (Tr. 10-23). Apel requested a review of the ALJ's decision by the Appeals Council. (Tr. 5-6). On July 27, 2013, the Appeals Council denied Apel's request for review. (Tr. 1-4). Thus, the decision of the ALJ stands as the final decision of the

1

Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000). Apel filed this complaint on September 24, 2014. (Doc. 1). The Commissioner filed an Answer. (Doc. 11). Apel filed a Brief in Support of his Complaint. (Doc. 23). The Commissioner filed a Brief in Support of the Answer. (Doc. 28). Apel did not file a Reply Brief.

## II.     Decision of the ALJ

The ALJ determined that Apel meets the insured status requirements of the Social Security Act through September 30, 2013, and had not engaged in substantial gainful activity since April 3, 2009, the alleged onset date of disability.[1] (Tr. 12). The ALJ found Apel had the severe impairments of diabetes mellitus with insulin dependence and coronary artery disease, but that no impairment or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12-17).

After considering the entire record, the ALJ determined Apel had the residual functional capacity ("RFC") to perform sedentary work, except the climbing of ladders, ropes, or scaffolding. (Tr. 18). It was determined that Apel should be limited to occasional exposure to hazards such as temperature extremes, vibration, unprotected heights, dangerous machinery, and other like hazards. (Id.). Additionally, the ALJ determined that Apel should be limited to simple routine tasks. (Id.). The ALJ found Apel unable to perform any past relevant work, but that there are jobs that exist in significant numbers in the national economy that he can perform, including a parking lot attendant, cashier, and information clerk. (Tr. 21-22). Thus, the ALJ concluded that a finding of "not disabled" was appropriate. (Tr. 23).

## III.    Administrative Record

The following is a summary of the relevant evidence before the ALJ.

### A.     Hearing Testimony

---

[1] At the hearing on July 10, 2012, Apel amended the onset date to October 14, 2010. (Tr. 34)

2

The ALJ held a hearing in this matter on July 10, 2012. The ALJ heard testimony from Apel and Mr. Gary Wimhold, a vocational expert. (Tr. 30-31).

### 1. Apel's testimony

Apel was 45 years old at the time of the hearing. (Tr. 34) He is married and has four children, ages 22, 17, 15, and 21. (Tr. 42-43) Apel also has custody of two children through legal guardianship, ages 9 and 2. (Tr. 43) He lives with his wife of 16 years and "all but one" of the children, including a two-year-old grandchild. (Id.) He has a high school education and vocational training from "truck driving school." (Tr. 46) Apel served in the United States Navy for three years before receiving an honorable discharge. (Id.) In a prior hearing held on December 1, 2003, Apel alleged disability based on his heart condition "and something else." (Tr. 34-35) He was denied benefits and returned to work in 2005 through 2009. (Tr. 34-35) He has not applied for any job since 2009. (Tr. 46) In a second hearing held on October 13, 2010, Apel alleged disability based on his heart condition, back pain and diabetes. He has appealed from the decision denying him benefits. (Tr. 35) Apel has never filed a workers' compensation claim, or applied for unemployment benefits. (Tr. 45) His wife does not work and is not disabled. (Id.)

Apel's relevant past work includes long distance truck driver and shipping and receiving clerk. (Tr. 35-36) He drove a truck from 2000 to 2009, but had to take time off for "surgeries and stuff." (Tr. 36) While a truck driver, Apel obtained a commercial drivers license (CDL). (Id.) Apel worked as a shipping and receiving clerk for Everlast from 1993 to 2000. (Tr. 37) In this job he lifted a lot of punching bags, sometimes manually, but also with equipment such as forklifts. (Tr. 36-37) When required, Apel would hand load the bags into a truck. (Id.)

3

Apel testified he is no longer able to perform his job as a truck driver because his diabetes diagnosis voids his CDL license. (Tr. 37-38) He is insulin dependent and takes four insulin shots a day; one after each meal or one before each meal and then one at night. (Tr. 39). At the time of the hearing his diabetes was not under control, possibly due to an autoimmune response caused by vitiligo, an autoimmune disease. (Tr. 39-40) Apel acknowledged that his vitiligo does not affect his ability to work. (Tr. 40) When asked how the diabetes would affect his work other than the voiding of his CDL license, Apel responded, "I can't really say that it would interfere with it. It's just, I don't know, I can't explain it." (Tr. 41)

Apel also complains of lower back pain and neuropathy from standing so long. (Tr. 38) In general, Apel cannot stand for more than 15 minutes at a time before his feet start to hurt. (Tr. 49-50) It feels as though his feet are swollen. (Tr. 38) He also experiences this feeling in his hands. (Id.) Although not swollen, Apel's hands and feet are painful. (Id.) His doctor advised him to sit down and elevate his feet to help with the pain. (Tr. 50) He does this 6 or 7 times a day for 10 to 15 minutes at a time. (Tr. 38, 49)

Apel describes his hand pain as part of his neuropathy, but also as a feeling similar to arthritis. (Tr. 39) This "arthritis" causes Apel to feel very little in his hands, sometimes even causing him to forget when he is holding a cigarette while he smokes. (Id.) Apel underwent hand surgery in 2006 due to an injury sustained during a "fight." (Tr. 49) There are days when he cannot pick up or properly hold items such as pens or cigarettes. (Tr. 53-54) This could also be caused by muscle spasms that Apel often experiences in his arms and legs. (Tr. 54) According to Apel, the spasms come and go for no reason and last for around 3 to 4 minutes each time. (Tr. 55) Most often, Apel experiences the muscle spasms when attempting to sleep. (Id.)

4

With regard to his heart disease, Apel claims the stress of lifting forces his heart rate to rise too high and causes him chest pain. (Tr. 41) Apel experiences sharp chest pains 3 to 4 times a day for periods of about 5 minutes. (Tr. 52-53) The pain is likely triggered by self-exertion, but also occurs when Apel is resting. (Id.) It was Apel's testimony that he took "nitro" for his heart condition following triple bypass surgery in 2003, but has not taken the medication in a long time. (Id.) Additionally, during a recent doctor's visit, Apel was informed that he may have a blockage in the lower part of his heart. (Id.) Nonetheless, Apel acknowledged that if he worked at a desk and was not forced to lift, then his heart disease would "probably not" be an issue. (Tr. 41) Recently, Apel was diagnosed with depression and bipolar disorder. (Tr. 55) He has the potential to become angry very quickly both with his family and people he does not know well. (Tr. 56)

In a typical day, Apel will get up early to drink coffee and try to walk, at most, six blocks. (Id.) He then returns home around noon to take a nap with his "daughter," a child over whom he has legal guardianship. (Id.) Apel testified he must nap due to fatigue. (Tr. 58) After napping, Apel remains up for the rest of the day, occasionally watching television. (Tr. 47-48) Due to fatigue and an inability to stand for extended period of time, Apel does not help with household chores. (Tr. 48) However, he does try to get out of the house to attend his nephew's baseball games. (Id.) Approximately 2 to 3 days a week, Apel experiences increased back pain and must remain in bed. (Tr. 51) On those days, he does not leave his house. (Id.) Recently Apel has been able to get out more as the result of a new medication that has helped him. (Tr. 56-57) Apel has been able to get more exercise than usual, but he still "[doesn't] really exercise a whole lot." (Tr. 57)

5

The ALJ questioned Apel regarding a May 21, 2012 doctor's visit. (Id.) Apel agreed with the doctor's observation that his lower back pain seemed to be under control through the combined medications of Cymbalta and Gabapentin. (Id.) However, the combination of pain medications only helps for about 4 hours before Apel must take aspirin or Tramadol. (Tr. 51) Similarly, Apel's blood sugar levels were controlled and Apel had denied any outstanding medical problems during his visit. (Tr. 49) According to Apel, Cymbalta makes him tired and dizzy when he takes it in the morning. (Tr. 57) Apel contends that the large number of medications he must take causes him to be constantly fatigued. (Tr. 57-58)

### 2. Testimony of Vocational Expert

Vocational expert Gary Wimhold testified that, as a shipping clerk, Apel actually performed a combination of duties. (Tr. 62) Wimhold classified part of the job as a warehouse worker, code 922.687-058, medium level unskilled, and the second part of the job as a receiving clerk, medium level with a specific vocational preparation level ("SVP") of 5. (Tr. 62-63) He classified Apel's work as a tractor trailer operator, code 904.383-010, as a medium level job, semiskilled in the area of transportation. (Id.) Also on Apel's work history list is the job of drywall applicator; code 842.361-030; this is a skilled trade and considered to be very heavy. (Id.)

For the first hypothetical, the ALJ asked Mr. Wimhold to assume a person of the same age, education, and experience as Apel capable of performing the full range of light work with the following limitations: non-exertional, necessary availability to sit or stand at will; never climbing ladders, ropes or scaffolds, should avoid only occasional exposure to temperature extremes, vibrations, and other hazards; and limited to simple, routine and repetitive tasks. (Tr. 66) Mr. Wimhold determined that such a person would not be able to perform any of Apel's past

6

work. (Id.) However, such a person would be able to perform a job such as parking lot attendant, Dictionary of Occupational Titles ("DOT") 915.473-010, SVP of 2, light work. (Id.) There are about 1,500 positions in the state and 75,000 nationally. (Id.) In addition, such a person could perform the job of cashier II, DOT 211.462-010, SVP 2, light work. (Tr. 66-67) There are 1,200 positions in the state and approximately 60,000 nationally. (Tr. 67) Finally, such a person could perform the job of information clerk, DOT 237.367-018, SVP 2, light work. (Id.) There are approximately 1,200 positions in the state and 60,000 nationally. (Id.)

For the second hypothetical, the ALJ asked Mr. Wimhold to assume the same factors identified above, but reduced the limitations to the full range of sedentary work as defined in the regulations. (Id.) This person would have non-exertional limitations of: never climbing ladders, ropes, or scaffolds; only occasional exposure to extreme temperatures, vibrations, unprotected heights, machinery and hazards; and limited to simple, routine tasks. (Id.) Mr. Wimhold determined that the previous jobs given under the initial hypothetical would apply to this hypothetical as well. (Id.)

Upon questioning by Apel's attorney, Mr. Wimhold testified that, as a parking lot attendant, Apel would be exposed to sun at least 50% of the time. (Tr. 68) It was also Mr. Wimhold's testimony that each of the hypothetical jobs would require occasional handling and fine fingering dexterity to make change, handle keys, and grasp small objects. (Tr. 68-69) Finally, Mr. Wimhold testified that each occupation would allow for no more than 10 to 15 minute work breaks, 30 minute lunch breaks and 2 days of leave per month. (Tr. 69)

### B. Medical Records

The ALJ summarized Apel's medical records at Tr. 17-19. Relevant medical records are discussed as part of the analysis.

7

### IV.  Standards

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also Brantley v. Colvin, 2013 WL 4007441, at * 2 (E.D. Mo. Aug. 2, 2013). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v.

8

Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [his] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, he will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v). Through step four, the burden remains with the claimant to prove that he is disabled. Brantley, 2013 WL 4007441, at *3 (citation omitted). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national

economy. Id. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Meyerpeter v. Astrue, 902 F.Supp.2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

The court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. Pate–Fires v. Astrue, 564 F.3d 935, 942 (8th Cir.2009). In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir.2002).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;
(2) The education, background, work history, and age of the claimant;
(3) The medical evidence given by the claimant's treating physicians;
(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
(5) The corroboration by third parties of the claimant's physical impairment;
(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and
(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

### V. Discussion

In his appeal of the Commissioner's decision, Apel raises two issues. First, Apel alleges the ALJ failed to address the medical opinions of record and explain the weight given to each. (Doc. No. 23 at 9-11) Second, he argues the ALJ failed to find his depression a severe

10

impairment. (Id. at 11-14) Upon review, the Court finds substantial evidence in the record to support the ALJ's decision.

**Opinion evidence**

First, Apel contends the ALJ did not discuss the restrictions his treating cardiologist, Mary Dohrmann, M.D., imposed on him or incorporate them into the RFC assessment. (Id. at 10) Dr. Dohrmann signed a Physician's Statement for Disabled License Plates/Placard on July 3, 2012, valid for 90 days. (Tr. 453) She checked boxes next to "The person cannot ambulate or walk 50 feet without stopping to rest due to a severe and disabling arthritic, neurological, orthopedic condition," and "The person has a cardiac condition to the extent that [his] functional limitations are classified in severity as Class III or Class IV according to the standards set by the American Heart Association."[2] (Tr. 453) In response the Commissioner correctly points out that a finding of disability by a state agency for purposes of issuing disabled license plates is not binding on the Commissioner. (Doc. No. 28 1t 14) See 20 C.F.R. § 416.904; Fisher v. Shalala, 41 F.3d 1261, 1262 (8th Cir.1994).

An ALJ must give a treating physician's opinion controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and not inconsistent with the other substantial evidence in the record. Davidson v. Astrue, 578 F.3d 838, 842 (8th

---

[2] The New York Heart Association Functional Classification distinguishes the functionality of the heart and its limit on physical activity with the following: Class I: No limitation of activity. Ordinary activity does not cause undue fatigue, palpitation, dyspnea or anginal pain. Class II: Slight limitations of physical activity. Patient is comfortable at rest. Ordinary activity results in fatigue, palpitation, dyspnea or anginal pain; Class III: Marked limitation of physical activity. Patient is comfortable at rest, but less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain. Class IV: Inability to carry out physical activity without discomfort. Symptoms of congestive heart failure may be present, even at rest. Increased discomfort with any physical activity. The Criteria Committee of the New York Heart Association. Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels. 9th ed. Boston: Little Brown, 1994:253–6. (http://www.my.americanheart.org/professional/statementsguidelines (last visited March 24, 2015).

11

Cir.2009). See also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir.2006); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir.2005).

The record indicates that Dr. Dohrmann completed the parking permit application after having seen Apel once, on July 3, 2012, one week prior to the hearing in this case. (Tr. 454-57) Dr. Dohrmann's opinion was, therefore, not necessarily due the deference ordinarily given to a treating source. See Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir.2004) (physician's letter was not an opinion of a treating source because physician had only met with claimant on three prior occasions).

Further, even if the opinion expressed by Dr. Dohrmann was the opinion of a treating source, the ALJ was entitled to assign it little weight. A physician's checkmarks on a form are conclusory opinions which can be discounted if contradicted by other objective medical evidence. See Stormo v. Barnhart, 377 F.3d 801, 805–06 (8th Cir.2004); Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001); Social Security Ruling 96–2p. Here, Dr. Dohrmann's opinion is inconsistent with the objective medical evidence and treatment records. Specifically, the stress echocardiography performed on July 3, 2012 indicated that "[t]he heart rate response to stress was normal. There was normal resting blood pressure with an appropriate response to stress ... There was no chest pain during stress. The stress test was terminated due to achievement of target heart rate. The stress ECG was normal. There were no stress arrhythmias or conduction abnormalities." (Tr. 455) A chest x-ray performed in May 2011 revealed no acute radiographic process. (Tr. 319) In addition, Apel had normal cardiac examinations on numerous occasions during which he denied chest pain and shortness of breath. (Tr. 347-48, 385-86, 438, 442, 449) When a treating physician's opinion is inconsistent with other substantial evidence in the record, the ALJ is entitled to give it less weight. Hogan, 239 F.3d at 961.

12

Because there is substantial evidence that Apel's allegations regarding the severity of his symptoms are not credible as discussed below, and because the medical evidence does not support his claims, a physician's authorizing a handicap parking placard is not substantial evidence of disability. See Springfield v. Astrue, 2010 WL 985306, at *20 (E.D.Mo. Mar. 15, 2010).

Next, Apel argues the ALJ failed to give good reasons for not adopting the opinion of his treating physician, Dr. Jamie M. Kauffman. (Doc. No. 23 at 11) "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000).

Dr. Kauffman submitted a letter in July 2012 opining that Apel had multiple impairments which would make it difficult for him to maintain a full-time job. (Tr. 452) The ALJ acknowledged Dr. Kauffman's treating relationship with Apel, but gave her opinion little to no weight because it was inconsistent with the objective medical evidence of record.[3] With respect to Apel's chronic low back pain for example, x-rays performed in June 2011 detected only mild spondylosis and wedging and an MRI of the lumbar spine conducted in July 2011 found minimal stenosis. Musculoskeletal exams showed Apel was only mildly tender and walked with a normal gait. (Tr. 13-14, 317, 446, 503) Similarly, Apel complained of hip and arm pain, but an exam found no joint pain or swelling, normal range of motion, and no hip joint pain with movement. (Tr. 14, 442) A neurological exam was negative for tremors, found normal strength, tone, and

---

[3] Apel argues the ALJ failed to clearly state the evidentiary weight given to Dr. Kauffman's opinion. (Doc. No. 23 at 11) The ALJ's decision states "Although Dr. Kauffman has a treating relationship with the claimant, the undersigned gives the opinion of Dr. Kauffman [sic] weight, because it is inconsistent with the overall objective medical evidence." (Tr. 20) When taken in context, however, it is clear the ALJ was discounting Dr. Kauffman's opinion and gave good reasons for doing so, as discussed herein.

13

bulk, and confirmed intact sensation and unremarkable gait. (Tr. 13, 344) Even with respect to Apel's diabetes and neuropathy, the ALJ noted there was no compelling evidence that his conditions have remained severe for the required 12-month duration. (Tr. 13, 19)

The ALJ also noted that Dr. Kauffman appeared to rely heavily on Apel's subjective reports of symptoms and limitations, accepting most of what he reported as true. (Tr. 19-20) However, the ALJ found Apel to be less than fully credible given the lack of objective medical evidence to support his allegations, his treatment history, and evidence that when he is compliant, medication effectively addresses his symptoms. (Tr. 12-21) See Gonzales v. Barnhart, 465 F.3d 890, 896 (8th Cir. 2006) (ALJ could give less weight to medical opinion because it appeared to be based solely on claimant' subjective complaints). Although Apel does not challenge the ALJ's credibility determination, the Commissioner addresses it in her brief. (Doc. No. 28 at 7-10) Upon review of the record as a whole, the Court finds the ALJ's determination not to credit Apel's subjective complaints is supported by good reasons and substantial evidence and the Court will defer to her determination. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

Finally, the ALJ did not err in discounting Dr. Kauffman's opinion because there is no deference for a treating physician's opinion that a claimant is disabled or cannot be gainfully employed because it invades the province of the Commissioner on the ultimate disability determination. House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007).

In sum, the Court finds the ALJ's treatment of the medical opinion evidence is supported by valid reasons and substantial evidence in the record as a whole.

**Severity of impairments**

In March 2011, Apel was diagnosed with major depressive order (MDD), moderate, and assigned a Global Assessment of Functioning (GAF) score of 51, indicating moderate symptoms. (Tr. 340) Apel has no reported history of psychiatric hospitalizations or psychotherapy prior to March 2011. (Id.) In March 2012, Apel reported problems with mood swings and was diagnosed with bipolar disorder. (Tr. 466-68) Apel argues the ALJ erred in failing to find his depression/bipolar disorder a severe impairment. The Commissioner responds that the ALJ's severity finding with respect to Apel's mental condition did not affect her ultimate decision, because she properly considered all of Apel's impairments when assessing his RFC, including those that were not severe. (Doc. No. 28 at 3-4)

At step two of the sequential process, the ALJ must determine that the claimant has a severe mental or physical impairment that has or is expected to last twelve months or will result in death. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(i)-(ii); 416.909, 416.920(a)(4)(i)-(ii). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir.2007); 20 C.F.R §§ 404.1520(c), 416.920(c). Basic work activities mean the abilities and aptitudes necessary to do most jobs, including physical functions; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, coworkers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b); 416.921(b). The claimant bears the burden of establishing that his impairment is severe. Kirby, 500 F.3d at 707 (citing Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir.2000)). Although severity is not an onerous requirement to meet, it is also "not a toothless standard." Id. at 708.

As a threshold matter, an ALJ is not necessarily required to find a severe impairment simply because a medical professional diagnoses the claimant with depression. See Buckner v. Astrue, 646 F.3d 549, 557 (8th Cir. 2011). Rather, the ALJ must evaluate the record evidence as a whole to determine whether the depression impacts a claimant's ability to work. Id. Here, the Court finds the ALJ's determination regarding the severity of Apel's depression/bipolar disorder is supported by substantial evidence in the record as a whole.

First, Apel's symptoms have improved with medication with minimal complaints of side effects. Treatment notes from May 2011 through March 2012 show he frequently reported that his mood was improved. He also reported feeling more energetic, interactive and motivated. (Tr. 350-51, 363, 374, 380-81, 387-88) Apel's mental status examinations were also consistent with his reports of improvement. Following a diagnosis of bipolar disorder in March 2012, Apel's medications were adjusted. He reported during an appointment in June 2012 that he was doing "great" with his medications, that his mood was more stable, making him more social and less irritable, and that he was not sleeping as much during the day. (Tr. 460) Also during this period, Apel's GAF scores increased, reflecting mostly mild symptoms. (Tr. 350-51, 360, 363-64, 374-75, 381, 387-88)

Second, the ALJ considered the opinion of the State Agency psychological consultant, Barbara Markway, Ph.D. (Tr. 16) Dr. Markway completed Apel's Psychiatric Review Technique in February 2011. Dr. Markway opined that Apel had no restriction of activities of daily living, no difficulties in maintaining social functioning or concentration, persistence or pace, and no repeated episodes of decompensation. (Tr. 306-316) The ALJ gave Dr. Markway's opinion great weight to the extent it demonstrated that Apel's mental impairments are not disabling, but found the evidence shows Apel's mental impairments support mild limitations. (Tr. 16)

Additionally, the ALJ considered Apel's mental impairments in relation to the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments, 20 C.F.R. Part 404, Subpt. P, App. 1, otherwise known as the Paragraph B criteria, and found they were not satisfied. (Tr. 16-17) Specifically, the ALJ found Apel had only mild restrictions in his daily living activities, social functioning, and concentration, persistence or pace. He had no episodes of extended decompensation. (Id.) The ALJ also noted that the majority of Apel's GAF scores were indicative of only mild symptoms. (Tr. 16)

Even assuming the ALJ erred at step two by not finding Apel's depression/bipolar disorder a severe impairment, any error was harmless because the ALJ still considered his mental impairments in formulating the RFC. 20 C.F.R. §§ 404.1545, 416.945. (Tr. 12) After a thorough discussion of the medical evidence regarding Apel's depression and bipolar disorder, the ALJ properly determined these impairments do not cause more than minimal limitation in his ability to perform basic mental work activities and are therefore nonsevere. (Tr. 15)

## VI. Conclusion

For these reasons, the Court finds the ALJ's decision is supported by substantial evidence contained in the record as a whole and, therefore, the Commissioner's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate judgment will accompany this Order.

Dated this 30th day of March, 2015.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE